398 F.2d 443
 SWITCHMEN'S UNION OF NORTH AMERICA, AFL-CIO, a voluntary association, General Adjustment Committee — Southern Pacific Company, Switchmen's Union of North America, a voluntary association; Neil P. Speirs, as International President, Switchmen's Union of North America; John R. Burge, as General Chairman, General Adjustment Committee — Southern Pacific Company Switchmen's Union of North America; Does One through One Thousand, individually and as representatives of the aforementioned associations, Appellants,
v.
SOUTHERN PACIFIC COMPANY, a corporation, Appellee.
 No. 21813.
 United States Court of Appeals Ninth Circuit.
 July 10, 1968.
 
 Russell M. Baker (argued), of Baker, Jordan & Foreman, Dallas, Tex., Leo M. O'Connor of O'Connor & Lewis, Sacramento, Cal., for appellant.
 William R. Denton (argued), W. A. Gregory, San Francisco, Cal., for appellee.
 Before HAMLEY and MERRILL, Circuit Judges, and CROCKER,* District Judge.
 HAMLEY, Circuit Judge:
 
 
 1
 Southern Pacific Company brought this action against Switchmen's Union of North America, AFL-CIO, and others, to enjoin a strike or work stoppage by all switchmen on the company's Pacific Lines (seven western states), and for damages in the amount of two million dollars. The district court granted a preliminary injunction and defendant union and others appeal therefrom. The damage claim is still pending in the district court.
 
 
 2
 The principal question presented here is whether, under the circumstances of this case, the district court had jurisdiction to enjoin the strike.
 
 
 3
 Section 1 of the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C. § 101 (1964), provides that no court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case growing out of a labor dispute, except in strict conformity with that Act. As applied to disputes arising under the Railway Labor Act, 44 Stat. 577 (1926), as amended, 45 U.S.C. §§ 151 et seq. (1964), this and other sections of the Norris-LaGuardia Act have been held to prevent the issuance of an injunction in a railway labor case involving a "major dispute," but to allow the issuance of an injunction in such a case where the controversy involves a "minor dispute," as labor disputes are traditionally categorized in the railway labor world. Brotherhood of Railroad Trainmen v. Chicago River & Indian R. R. Co., 353 U.S. 30, 42, 77 S. Ct. 635, 1 L.Ed.2d 622; Butte, Anaconda & Pacific Ry. Co. v. Brotherhood of Locomotive Firemen and Engineers, 9 Cir., 268 F.2d 54, 58-59.
 
 
 4
 The union contends that the controversy which gave rise to the strike here in question was a major dispute and that therefore, under the principles referred to above, the district court was without jurisdiction to enjoin the strike. The company, on the other hand, argues that the underlying controversy was a minor dispute.
 
 
 5
 Major disputes are those which relate to the formation of collective bargaining agreement or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. As the Supreme Court said in Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886: "They [major disputes] look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past."
 
 
 6
 Minor disputes contemplate the existence of a collective agreement or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event, the Supreme Court observed in the Elgin case, 325 U.S. at 723, 65 S.Ct. at 1290, "the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement * * *."
 
 
 7
 In the light of these tests, we turn to a consideration of the circumstances giving rise to the strike in question, substantially as set out in the union's brief.
 
 
 8
 Prior to Friday, February 20, 1967, four yardmasters, including J. D. Shockley, were employed by the company on its property at Tucumcari, New Mexico. On that date the last of these four yardmaster positions was abolished by the company. On March 11, 1967, Shockley was permitted by the company to displace yardmaster James L. Hill at Southern Pacific's Tucson, Arizona yard. Hill had been promoted to yardmaster in the Tucson yard under Article 12(a) of the yard agreement, dated September 1, 1956, then in existence between the Switchmen's Union and the company.[1]
 
 
 9
 As of March 11, 1967, employees of the Southern Pacific of the craft of yardmen and switchmen were represented by defendant union, and the yardmaster employees of the company were represented by Railroad Yardmasters of North America, Inc. On March 29, 1965, the Railroad Yardmasters of North America, without the knowledge, consent or participation of defendant union, entered into an agreement with the company. The relevant part of Article 8, Section (a) of that agreement is quoted in the margin.[2]
 
 
 10
 Defendant union took the position that Article 8, Section (a) of the Railroad Yardmasters agreement is in direct conflict with Article 12(a) of the agreement then in effect between defendant union and Southern Pacific. It also contended that Article 8, Section (a) was in direct conflict with forty-seven years of established practices the company had with defendant union, and twenty-seven years of established practices the company had with Railroad Yardmasters of North America.[3] Accordingly, defendant asserted, the displacing of yardmaster Hill with yardmaster Shockley on March 11, 1967, was a direct, unequivocal and unilateral abrogation by the company of the agreement then in effect with defendant union, and of the long-established practices referred to above.
 
 
 11
 The company disagreed with defendant union, taking the position that while Article 12(a) of the agreement between them prescribes the manner and qualifications for promotion of switchmen at Tucson, the incident here in question involved not a promotion of switchmen to yardmaster, but an assignment of a yardmaster from Tucumcari to Tucson.
 
 
 12
 The dispute being unresolved, the union called a strike on March 12, 1967. The company then sought and obtained the injunction from which this appeal was taken.[4]
 
 
 13
 The facts recited above indicate to us that the controversy in question was a minor dispute. While, under the union's construction of the agreement and of the long-standing practices, the company was claiming a right or authority not theretofore recognized, the company's position was that it was proceeding in accordance with the existing agreement and practices. Thus, all that was involved was a disagreement as to the construction and significance of an existing agreement and existing practices.
 
 
 14
 To apply the test prescribed in Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886, no effort was made by either party to bring about a formal change in the terms of the existing agreement or to create a new agreement. Formal changes in an agreement or the creation of a new agreement could be accomplished only by joint consenting action by the union and the company. Neither the company nor the union sought this. They each proceeded unilaterally on the basis of their respective and conflicting interpretations of the existing arrangements between them.
 
 
 15
 When the position of either side in a controversy between a railroad company and a union representing some of its employees goes no further than to put in bona fide issue the interpretation of an existing contract, only a minor dispute is involved. Hudie v. Aliquippa & Southern R. R. Co., (W.D.Pa.) 249 F.Supp. 210, 212, affirmed, 3 Cir., 360 F.2d 213; St. Louis, San Francisco and Texas Ry. Co. v. Railroad Yardmasters of America, AFLCIO, 5 Cir., 328 F.2d 749, 752. See also, Order of Railway Conductors v. Pitney, 326 U.S. 561, 566-567, 66 S.Ct. 322, 90 L. Ed. 318.
 
 
 16
 It is true, as the union points out, that a controversy, although couched in terms of a disagreement as to interpretation of a contract, may under some circumstances be regarded as a major dispute. This result may be reached if it can be said that the change being imposed by one side on the other is in nowise contemplated or arguably covered by the agreement. The provisions of the Railway Labor Act may not be avoided merely through the device of unilateral action which the actor purposefully intends shall not become a part of the agreement. The major-minor dispute dichotomy does not relate to artfully contrived formalistic demands or responses, but to matters of substance. United Industrial Workers of the Seafarers International Union v. Board of Trustees, 5 Cir., 351 F.2d 183, 188-189; Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 2 Cir., 307 F.2d 21, 33-34.
 
 
 17
 But where the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, as illuminated by long-standing practices, the question of whether the position is well taken involves a minor dispute. We think this is such a case.[5]
 
 
 18
 The union argues that the district court erred in granting the injunction because the company did not use every reasonable effort to settle the dispute prior to seeking the injunction, as required by Section 8 of the Norris-LaGuardia Act, 47 Stat. 72 (1932), 29 U.S.C. § 108 (1964). See Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 2 Cir., 307 F.2d 21, 38-42. See, also, Brotherhood of R. R. Trainmen v. Toledo, Peoria & Western R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, 150 A.L.R. 810.
 
 
 19
 The union does not point out, however, wherein the company failed to perform its obligations under the minor dispute provisions of the Railway Labor Act, or wherein the company lacked good faith in attempting to settle the dispute. Indeed, our own review of the record indicates that there was no unfair surprise in the "bumping" of Hill by Shockley, and that the company, in good faith, attempted to confer on the issue prior to the incident which led to the strike.
 
 
 20
 Affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable M. D. Crocker, United States District Judge for the Eastern District of California, sitting by designation
 
 
 [1]
 Article 12(a) reads as follows:
 "Section (a). Switchmen will be promoted in their respective yards, helper to foreman, foreman to yardmaster; seniority and ability to govern. As a prerequisite to promotion to yardmaster, it will be necessary for the applicant to have served at least one (1) year (306 days) as engine foreman in the yard where promoted * * *"
 
 
 [2]
 Article 8, Section (a):
 "Yardmasters included within the scope of this agreement constitute one seniority class. A yardmaster's seniority will begin from the date that he is assigned to a position by assignment notice, except as otherwise provided in this article, and shall be confined to the yard where promoted as long as yardmaster's service is maintained in such yard. In the event all yardmasters' service is thereafter discontinued at such yard. any yardmaster who transfers therefrom to another yard where yardmaster's service is maintained, within six months of the date the last yardmaster's assignment is discontinued, shall be accorded the same seniority date as yardmaster in the yard to which he transfers except that any yardmaster promoted in that yard prior to June 1, 1963 will have protected seniority in that yard * * *
 "Any yardmaster who transfers to another yard under this provision will qualify for yardmaster's service in that yard on his own time."
 
 
 [3]
 According to defendant union, this conflict results from the fact that Article 8, Section (a) of the Railroad Yardmasters agreement disregards and runs counter to the provision of Article 12(a) of the agreement between defendant union and the company and forty-seven years practice, giving switchmen, irrespective of which union was certified, the exclusive right of promotion or appointment from switchmen to yardmaster, and the principle that yardmen promoted in respective yards only had yardmaster seniority in the yard where promoted
 
 
 [4]
 Thereafter, the company submitted the merits of the dispute to the National Railroad Adjustment Board, which is authorized by statute to make a final award binding upon both parties in matters involving minor disputes. Section 3, First (m) of the Railway Labor Act, 45 U.S.C. § 153 (1964); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. R. Co., 353 U.S. 30, 34, 77 S.Ct. 635, 1 L.Ed.2d 622. Notice was given to defendant union in accordance with the Board's procedures. The Board took jurisdiction and the Fourth Division of the Board rendered its award No. 2262 and order in Docket 2306 on February 7, 1968. The Division held that the company properly interpreted and applied the controlling agreements when it permitted yardmaster Shockley to displace yardmaster Hill. That award is now final
 
 
 [5]
 As stated in note 4 above, the Adjustment Board found that the company's position as to the meaning of the existing agreement was not only arguable, but that it was correct